E-FILED
Monday, 05 January, 2015  10:24:53 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| NANCY J. HUSKINS, | ) | No. 14-CR-30028 |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S COMMENTARY ON SENTENCING FACTORS

**NOW COMES** Defendant, Nancy J. Huskins, by and through her attorney, Daniel Noll, Noll Law Office LLC, and for her Commentary on Sentencing Factors, submits to this Court the following objections, addendums, comments and briefs, pursuant to *Local Rule 32.1*: "Implementation of Sentencing Guidelines," and order of the Court:

## BACKGROUND

**Prefatory Comments –** The Defendant's commentary herein applies to the Revised Presentence Investigation Report filed November 6, 2014.  The sentencing hearing for the Defendant is scheduled for January 26, 2015, at 2:30 p.m., in the Springfield Division of the United States District Court for the Central District of Illinois, the Honorable Sue E. Myerscough, United States District Judge, presiding.

The purpose of this Sentencing Commentary is to assist the Court in determining an appropriate sentence for Nancy J. Huskins.  Nancy J. Huskins submits that a sentence of one year and a day in the Bureau of Prisons is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. §3553(a)(2).

**Case Overview –** On July 10, 2014, a single-count Information was filed in U.S. District Court, Springfield, Illinois, charging that from on or about January 1, 1996, to November 4, 2013, the Defendant, an employee of State Bank of Lincoln (SBL) in Lincoln, Illinois, embezzled and misapplied a sum of approximately $1,982,685 from the SBL.

On the same date as the filing of the Information, the Defendant had her initial appearance in court before U.S. Magistrate Judge Tom Schanzle-Haskins, at which time she pled guilty to the sole count of the Information pursuant to a written plea agreement. The Defendant was released on a $10,000 personal recognizance bond.

## SENTENCING HEARING CONSIDERATIONS

**Defendant's Burden –** Under the holding in *United States v. Coonce*, 961 F.2d 1268 (7th Cir. 1992), the Defendant acknowledges her burden to produce evidence when challenging the accuracy and completeness of the Presentence Investigation Report.

***Pro Se* Objections –** The Defendant has been advised that she may present objections, commentary and addendums, as are allowable under the *Rone* decision. See *United States v. Rone*, 743 F.2d 1169; 1984 U.S. App. LEXIS 18951 (7th Cir. 1984). The *Rone* case implements Federal Rules of Criminal Procedure 32(a) (1) (A), 32(c) (3) (A), and 32(c) (3) (D).

A sentencing court must ensure that a Defendant has had an opportunity to read the Revised Presentence Investigation Report and to confer with his attorney about it for a reasonable period of time before the sentencing hearing, and to comment adversely on its accuracy at the hearing. This allows a Defendant to present to the court any matters that a Defendant feels have not been fully presented by his defense attorney.

Counsel for Mrs. Huskins has advised her of her right to present objections to the Revised Presentence Investigation Report. Counsel for the Defendant does not anticipate any pro se objections.

**Mitigation Evidence** – The Defense intends to call as witnesses the following friends and family members, who will outline the Defendant's personal background, her family situation and positive character traits, including but not necessarily limited to the following:

- Tom Zurkammer, brother-in-law of the Defendant.

- Randy Sank, friend of the Defendant.

- Margaret Peifer, friend of the Defendant,

In addition, the Defense will call as a witness Dr. Leslie Fyans, a clinical psychologist, who will testify about the Defendant's mental state and how her childhood upbringing affected her actions.

The Defendant has also forwarded to the U.S. Probation Office character reference letters from friends, family and a written report from Dr. Fyans. The Defendant requests that the Court review these documents and make them part of the sealed record of the sentencing hearing, as the Court would do with the Presentence Investigation.

**Right of Allocution** – The Defendant has been advised of her procedural right to allocution at the time of sentencing. It is anticipated that the Defendant will make a statement to the Court at that time. The Defendant will state to the Court that she accepts full responsibility for her actions, which is demonstrated by her plea of guilty and through her assistance with the State Bank of Lincoln. The Defendant will confirm that she could not be more remorseful about her conduct, and that she is sincerely apologetic to her family for the pain and suffering to which

she has subjected them due to this incident as well as to the State Bank of Lincoln for her actions.

**Objections -** The Presentence Investigation Report has been properly completed by U. S. Probation Officer Michelle Cyrus.   At the Addendum to the revised report, Ms. Cyrus has correctly set forth the outstanding objections that remain unresolved.

That said, according to the written job description from the State Bank of Lincoln, a copy of which is attached as Exhibit 1 and herein incorporated by this reference, Mrs. Huskins, was considered an ordinary teller. Her job description depicts no managerial or professional discretion. Furthermore, when compared to the examples laid out in §3B1.3 note 1 (embezzlement of client's funds by an attorney serving as guardian, bank executive's fraudulent loan scheme, criminal sexual abuse of patient by a physician), it is clear that Mrs. Huskins is not the type of defendant that the enhancement was designed for.

In fact, if Mrs. Huskins is given the 2 level enhancement for abuse of position of trust, it is hard to imagine a bank employee in a small bank who could not get the enhancement. The reason being is that in small banks, such as State Bank of Lincoln, even the lowest level employees are entrusted with financial information and handling of funds. Moreover, given the nature of smaller banks, employees tend to be "utility infielders," who handle a wide range of duties depending on the needs of their bank on any given day.

## I.        ADVISORY GUIDELINE RANGE

The Probation Officer has calculated an advisory guideline range of 51-63 months resulting from an adjusted offense level of 24 and a Criminal History Category 1. This guideline range offers no useful advice because it (1) is the product of a guideline that is not based on empirical evidence or national experience; (2) fails to take any account of Mrs. Huskin's low risk

4

of recidivism, need to make restitution, or collateral punishment; (3) is against the national sentencing trends; and (4) is far greater than necessary to promote the goals of sentencing.

## II.     FACTUAL BACKGROUND

Nancy Jo Huskins was born on September 10, 1951, in Lincoln, Illinois. She was the youngest child of Byron Jones and Loretta Jones. Nancy had five siblings: Sharon Sullivan; Judy Ollis; Donald Jones; and twins, Connie Zurkammer and Carol Berger. Nancy also has two half-siblings, Byron James Jr. and Doris, whose last name is unknown.

Born the daughter of a baker and an office clerk, Nancy Huskins had a rough upbringing. Her father was an alcoholic who would leave her family for days at a time. Her mother worked as an office clerk and part-time bartender to help pay the bills. Nancy was often teased at school for the condition of her clothes. Nancy worked part-time jobs in high school to pay for her school lunches and what clothing she could purchase. At school, she cleaned the music room three times per week to pay for her piano lessons.

On March 6, 1971, Nancy married her husband, Strawther Huskins. They have been married for 43 years. They have three children: Rebecca Maxey, Brian Huskins, and Bradley Huskins. In addition, Mrs. Huskins has four grandchildren and one great-grandchild. Both Ms. Maxey and Bradley Huskins are currently unemployed and reside at Nancy Huskins' home. Moreover, her granddaughter, Hannah Maxey, and Hannah's two-year-old son also reside at her home.

Mrs. Huskins asks the Court to consider not just her criminal acts, but also her lack of prior criminal history; her underlying mental issues, which contributed, in part, to the offense; and her genuine desire to make restitution to the victim. A sentence within the advisory guideline

range is far in excess of what is just or necessary in this case. A sentence of one year and a day is the just result.

### III.    A SENTENCE OF ONE YEAR AND ONE DAY WOULD BEST SATISFY THE GOALS OF §3553(a).

(a) **Factors To Be Considered in Imposing a Sentence.** — The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of

Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement—

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

The sentencing guidelines no longer bind the sentencing judge. *Hawkins v. U.S.*, 706 F.3d 802, 822 (7th Cir. 2013). The sentencing judge may not even *presume* that a sentence within the applicable guidelines range would be proper. *Id.* The judge must determine whether the sentence is consistent with the sentencing considerations set forth in 18 U.S.C. § 3553(a), and if she finds it is not she may impose it even though it is within the applicable guideline range. *Id.* citing *Nelson v. U.S.* 555 U.S. 350, 351-352 (2007).

The first step in sentencing, calculating the guideline range correctly, was not changed by *Booker. Hawkins* at 822. However, the step is less important now that the guidelines are merely advisory and the sentencing judge, being forbidden to presume the reasonableness of a guideline sentence, must make an independent determination of whether a guideline sentence would comport with the sentencing standard set forth in 18 U.S.C. § 3553(a).

"While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case." Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses,* 25 Crim. Just. 34, 37 (2011); *see also United States v. Ovid,* slip op., 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so.") A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which are taken into account by the guideline range.

**A.   Need for just punishment in light of the seriousness of the offense.**

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005). The guidelines include none of the factors bearing on Mrs. Huskins' degree of culpability.

i.   **Mrs. Huskins' embezzlement was sculpted by her upbringing and motivated by her and her family's financial hardship.**

According to the report of clinical psychologist Dr. Leslie J. Fyans, a copy of which is attached hereto as Exhibit 2 and herein incorporated by this reference, Mrs. Huskins' "early life of instability of [her] parents and the destitute circumstances [growing up] helped sculpt her current behavior." As Dr. Fyans noted, "[i]t is likely that her years of instability and transience of her childhood created in her a great fear and drove her motivation to assure that her family would be stable financially and to help others she felt were in need." This is reflected by the fact that a large number of deposits made with embezzled funds were given to family members. While it is troublesome that this theft occurred over a 17-year period, Dr. Fyans opined that her behavior of stealing became "habituated over time, hence [it] became easier…It also assuaged her fears of an unstable family."

ii.   **Mrs. Huskins has already been punished.**

This Court should consider Mrs. Huskins' loss of profession and reputation, *see, e.g., United States v. Gaind,* 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure

where defendant was punished by the loss of his business); *United States v. Vigil,* 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); *United States v. Samaras,* 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction). This is further documented by the news articles which are attached hereto as Group Exhibit 3.

### iii.    Need for Deterrence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels … reached that conclusion, as has every major survey of the evidence." *Id.; see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm; Restorative Justice and White Collar Crime,* 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsh *et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999). The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates … were not sufficient to achieve

statistical significance." *Id.* at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995); *see also* Gabbay, *supra,* at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence, prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,* 91 Prison J. 48S, 50S-51S (2011).

### iv.   Need for Incapacitation

#### 1.  Mrs. Huskins has an exceptionally low risk of recidivism.

Mrs. Huskins is a white female, 63 years old, first offender, high school graduate, employed throughout her adult life, married for 43 years, and who has no history of alcohol or drug abuse. For all Category 1 defendants who are white, there is a 16% recidivism rate, the lowest of any racial group. Exhibit 4, U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, pg. 28 (hereinafter "Measuring Recidivism"). Throughout all Criminal History Categories, women (13.7%) are almost half as likely to reoffend compared to men (24.3%).*Id.*  In Criminal History Category 1, there is a 10% recidivism rate for females. *Id.* For those who are over the age of 50 at the time of sentencing, the rate is only 6.2% in Criminal History Category 1. *Id.*

Those Criminal History Category 1 defendants who have a high school education only have a 10.6% rate of recidivism and those who were married only have a 9.8% of recidivism. *Id.* at 29. Criminal History Category 1 defendants with no illicit drug use (10.8%) are less than half likely to reoffender than those who use illicit drugs (21.9). *Id.* For those like Mrs. Huskins who are educated, have been employed, have been married, are drug free and over the age of 50, the recidivism rate is certainly much lower.

For those Criminal History Category 1 defendants convicted under the fraud guidelines, the recidivism rate is just 9.3%, the lowest of any offense category. *Id.* at 30. Finally, offenders like Mrs. Huskins with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *See* Exhibit 5, Sent'g Comm'n, *Recidivism and the "First Offender,"* at 13-14 (May2004) [hereinafter *First Offender*].

The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account. *See First Offender* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"); *Measuring Recidivism* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines if incorporated into the criminal history computation"). The Commission has not implemented any such revisions to the criminal history guidelines, but has recently stated that age "may be relevant" in granting a departure. USSG § 5H1.1, p.s.

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mrs. Huskins, this Court should consider the statistically low risk of recidivism presented by Mrs. Huskins' history and characteristics. *See, e.g., United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton,* 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district

court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt,* 486 F.3d 1997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Urbina,* slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera,* 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States,* 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum,* 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

**2.    Due to her voluntary execution of the Stipulation and Consent to the Issuance of an Order of Prohibition from Further Participation with the Federal Deposit Insurance Corporation ("FDIC"), Mrs. Huskins will be unable to commit a similar offense in the future.**

Under the plea agreement in this case, Ms. Huskins executed a Stipulation and Consent to the Issuance of an Order of Prohibition from Further Participation with the FDIC. d/e 4, ¶ 15. Pursuant to the Order of Prohibition from Further Participation, a copy of which is attached as Exhibit 6 and herein incorporated by this reference, Mrs. Huskins is prohibited from:

(A)        participating in any manner in the conduct of any financial institution or

organization;

13

(B)     soliciting, procuring, transferring, attempting to transfer, voting, or attempting to vote any proxy, consent or authorization with respect to any voting rights in any financial institution;

(C)     violating any voting agreement previously approved by the appropriate Federal banking agency; or

(D)     voting for a director, or serving or acting as an institution-affiliated party. Ex. 6, pgs. 3-4.

In determining whether there is a need for imprisonment to prevent future crimes, the defendant's inability to commit similar crimes in the future is highly relevant. *See, e.g., United States v. Olis,* 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (granting substantial variance in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct."). A substantial term of imprisonment is unnecessary to prevent Mrs. Huskins from committing similar crimes in the future.

### 3.  Need to Avoid Unwarranted Disparities and Unwarranted Similarities

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar conduct. 18 U.S.C. §3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, *see Gall v. U.S.*, 552 U.S. 38, 55 (2007) ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); *U.S. v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the defendants), and unwarranted differences among defendants

14

whose conduct and characteristics are similar. *See U.S. v. Parris*, 573 F. Supp. 2d 744, 753, 756-762 (E.D.N.Y. 2008).

According to the United States Sentencing Commission 2012 Sourcebook of Federal Sentencing Table 27a, a copy of which is attached as Exhibit 7, in fiscal year 2012, there were 322 embezzlement convictions. Of those cases, 42% were sentenced below the guideline range. The 42% below the guideline range was comprised of 9% government sponsored sentences below the guideline range and 33.2% non-government sponsored sentences below the guideline range.

According to the United States Sentencing Commission 2013 Sourcebook of Federal Sentencing Table 27a, a copy of which is attached as Exhibit 8, in fiscal year 2013, there were 338 embezzlement convictions. Of those cases, 37% were sentenced below the guideline range. The 37% below the guideline range was comprised of 10.1% government sponsored sentences below the guideline range and 27.8% non-government sponsored sentences below the guideline range.

However, given the relatively small sample size of embezzlement cases, it is much more instructive for the Court to review the 2012 and 2013 statistics for fraud cases. This is true because there is a substantially larger number of fraud cases across the country and hence a larger amount of data which can be analyzed. Furthermore, fraud and embezzlement cases are both calculated under the Sentencing Guidelines under §2B1.1. "Commentators have noted that inasmuch as theft and fraud offenses are conceptually similar, there is no strong reason to sentence them differently." USSG, App. C, Amend. 617 (Nov. 1, 2001).

In fiscal year 2012, there were 8,237 fraud convictions. Exhibit 7. Of those cases, 47.5 % were sentenced below the guideline range. The 47.5% below the guideline range was comprised

of 23.7% government sponsored sentences below the guideline range and 23.8% non-government sponsored sentences below the guideline range. Exhibit 7.

In fiscal year 2013, there were 7,543 fraud cases. Of those, sentences below the guideline range were imposed in 50.3% of all fraud cases. That 50.3% is comprised of  24.4% government sponsored sentences and 25.9% non-government sponsored sentences. Exhibit 8**.** The chart below includes a sample of fraud cases (as they are sentenced under the same guidelines) from districts across the country, many of which involved losses far greater than in this case, in which the defendants received sentences substantially below the guideline ranges applicable in those cases, and, in some cases, substantially below the guideline range of 51-63 months applicable here. Unlike here, none of the defendants in the chart below received a departure based upon cooperation and some defendants were convicted at trial. This Court should take into account the national sentencing trend exemplified by the Commission's data and this chart.

In *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y.2008), Judge Block in the Eastern District of New York took a similar collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders. At the court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases. *Id.* at 752. Based on these samples, the court concluded that "[t]hose [defendants] who were not cooperators and were responsible for enormous losses were sentenced to double digit terms of imprisonment (in years);[while] those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id.* at 753. The court relied upon this national pattern in arriving at a sentence of 60 months for the two defendants who faced an advisory guideline range of 360 to life, which was 16.7% of the bottom of the applicable guideline range. *Id.* at 745.

Unlike the defendants in *Parris*, who had no particular mitigating factors, there are substantial mitigating factors here which justify a sentence of a year and a day.

| Case | Conviction | Loss | Guideline Range | Sentence Imposed/ % of guideline range |
|------|-----------|------|-----------------|----------------------------------------|
| Christian Milton, AIG, Vice President (D. Conn. 2009) | Convicted at trial of various counts of fraud. | | Life Imprisonment | 48 months,[i] 10% of guideline range; life treated as 470 months |
| Ronald Ferguson, CEO, General Reinsurance Corp. (D. Conn. 2008) | Convicted at trial of conspiracy, securities fraud, false statements to SEC, mail fraud | $544 million | Life Imprisonment | 24 months,[ii] 5% of guideline range; life treated as 470 months |
| John Whittier, Manager, Wood River Partners (S.D.N.Y. 2007) | Pled guilty to securities fraud, failure to disclose ownership in excess of 5% of publicly traded security, and failure to disclose ownership in excess of 10% of publicly traded security. | $88 million (Ordered in restitution) | 188-235 months | 36 months,[iii] 19% of guideline range |
| Richard Adelson, CEO & President, Impath (S.D.N.Y. 2006) | Convicted at trial of conspiracy, securities fraud, and filing false reports with SEC. | $50-$100 million (court ordered $50 million in restitution) | Guidelines called for life imprisonment; statutory maximum was 85 years. | 42 months;[iv] 9% of guideline range; life treated as 470 months. |
| Jamie Olis, Tax Lawyer, Dynegy (S.D. Tex 2006) | Convicted at trial of: (1) conspiracy to commit securities fraud, mail fraud, wire fraud, (2) securities fraud; (3) mail fraud, and (4) wire fraud. | $79 million | 151-188 months | 72 months,[v] 47% of guideline range |
| Stephen Richards, Sr. Vice President,  Computer Associate (E.D.N.Y. 2006) | Pled guilty to conspiracy to commit securities fraud and wire fraud, securities fraud, false statements to SEC, conspiracy to obstruct justice, obstruction of justice, and perjury. | $2.2 billion (according to Government's Sentencing Memorandum) | Life Imprisonment under 2005 Guidelines, 151-188 under 1998 Guidelines (unclear how District Court resolved dispute over which version should apply) | 84 months,[vi] 38% of guideline range; life treated as 470 months |
| Carole Argo, CFO, SafeNet, Inc. (S.D.N.Y. 2008) | Pled guilty to securities fraud. | $1-2.5 million (stipulated loss amount) | 97-121 months | 6 months,[vii] 6% of guideline range |

The national sentencing trend is further exhibited through the Sentencing Commission's 2014 Third Quarter Data Report from June 30, 2014. The two graphs below depict the average sentence length and average guideline minimum for two sets of data. The first set, labeled

17

"Figure C," portrays the average sentence length and average guideline minimum for all cases from fiscal years 2009 through June 30, 2014. The second data set, labeled "Figure D," charts the average sentence length and average guideline minimum for §2B1.1 offenders from fiscal year 2009 through June 30, 2014.These graphs make it clear that the national average sentence is below the minimum guideline range In addition, the national average sentence for all cases sentenced under §2B1.1 (including embezzlement cases) is below the minimum guideline range.



**Figure C**

AVERAGE SENTENCE LENGTH AND AVERAGE GUIDELINE MINIMUM
QUARTERLY DATA FOR ALL CASES[1]

**Fiscal Years 2009 - 2013,**
**3rd Quarter 2014 Preliminary Cumulative Data (October 1, 2013, through June 30, 2014)**

[1] Cases with guideline minimums of life or probation were included in the guideline minimum average computations as 470 months and zero months, respectively.  In turn, cases with sentences of 470 months or greater (including life) or probation were included in the sentence average computations as 470 months and zero months, respectively.  In addition, the information presented in this table includes time of confinement as described in USSG §5C1.1.  Guideline minimums account for applicable statutory mandatory penalties.  Descriptions of variables used in this figure are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2009 - 2013 Datafiles, USSCFY09 - USSCFY13, and Preliminary Data from USSCFY14 (October 1, 2013, through June 30, 2014).



Figure D

**AVERAGE SENTENCE LENGTH AND AVERAGE GUIDELINE MINIMUM QUARTERLY DATA FOR §2B1.1 OFFENDERS (THEFT, PROPERTY DESTRUCTION, AND FRAUD)[1]**
Fiscal Years 2009 - 2013,
3rd Quarter 2014 Preliminary Cumulative Data (October 1, 2013, through June 30, 2014)

Figure includes only cases with a primary sentencing guideline of USSG §2B1.1 (Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligation of the United States). Additionally, cases with an amendment year prior to 2001 were excluded from this figure because prior to this time fraud cases were reported separately at USSG §2F1.1. Cases with guideline minimums of life or probation were included in the guideline minimum average computations as 470 months and zero months, respectively. In turn, cases with sentences of 470 months or greater (including life) or probation were included in the sentence average computations as 470 months and zero months, respectively. In addition, the information presented in this table includes time of confinement as described in USSG §5C1.1. Guideline minimums account for applicable statutory mandatory penalties. Descriptions of variables used in this figure are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2009 - 2013 Datafiles, USSCFY09 - USSCFY13, and Preliminary Data from USSCFY14 (October 1, 2013, through June 30, 2014).

### 4. Need to Provide Restitution to State Bank of Lincoln

In determining the appropriate sentence, this Court must consider the "need to provide restitution to any victims of the offense." *See* 18 U.S.C. §3553(a)(7); *see also*, e.g. *U.S. v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging a district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense…is better served by a non-incarcerated and employed defendant"); *U.S. v. Peterson*, 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005)(granting a variance so that defendant could work and pay restitution).

The State Bank of Lincoln is requesting over $2 million in restitution in this case and Mrs. Huskins wishes to provide it to the best of her ability. If Mrs. Huskins is to be sentenced within the advisory guideline range, she would not be released until she is in her late sixties. At that point, her age, health problems and life expectancy would make it nearly impossible for her

19

to make any dent in the restitution. This Court should seek to maximize, rather than eliminate, Mrs. Huskins' ability to make restitution to the State Bank of Lincoln.

### 5. Kinds of Sentences Available

This Court must now consider all of "the kinds of sentences available" by statute, §3553(a)(3), even if the "kinds of sentence…established [by] the guidelines" zones recommend only a lengthy prison term. *Gall v. U.S.*, 552 U.S. 38, 59 & n.11 (2007). The sentence requested by the Defendant is especially appropriate in light of her age and desire to make restitution.

Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, §239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note). Mrs. Huskins clearly is not a "violent and serious offender" who "pose[s] the most dangerous threat to society." She wishes to work to make restitution and should be given the opportunity to do so.

20

**IV.    The Guideline Range Provides No Useful Advice Because It is Not Based on Empirical Evidence or National Experience, and Fails to Promote Any Purpose of Sentencing**

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing." 28 U.S.C. §991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point." 28 U.S.C.§ 994(m). The Commission was to continually review and revise the guidelines in light of sentencing data, criminology research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16). The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the guidelines on an empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).

In *Rita v. U.S.*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve §3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id.* at 384-350.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. U.S.*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. U.S.*, 552 U.S. 85, 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 109-110.

Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. U.S.*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. 101-102; *Rita*, 551 U.S. at 351, 357.

**A. Mrs. Huskins' guideline range is 210% of the average past practice sentence and the original guideline range.**

When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white-collar offenses. Breyer, *supra*, 17 Hofstra L. Rev. at 22-23. The Commission required some form of confinement for all but the least serious cases, and adopted a fraud guideline requiring no less than 0-6 months and no more than 30-37 months for defendants in Criminal History Category I. *See* USSG § 2F1.1 (1987). The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared to with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987); *see also* U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 56 (2004)

[hereinafter *Fifteen Year Report*] (Commission sought to ensure that white collar offenders faced "short but definite period[s] of confinement").

The Commission's deterrence rationale was not based on empirical evidence. The empirical research regarding white-collar offenders shows no difference between the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et. al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995). "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, *Exploring the Limits of Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).

Moreover, the Commission quickly abandoned its original goal of ensuring "short but definite" sentences. Beginning just two years after the Guidelines went into effect, prison sentences for embezzlement offenders were steadily increased. The effect of those increases on this case was to add three levels to loss in 1989, to add two additional levels for loss in 2001, to increase the base offense level by two levels in 2001, to increase the base offense level by one level in 2003, and to add two levels for over $1 million in gross receipts from a financial institution in 2001 and 2003. As a result, Mrs. Huskins' advisory guideline range is now over double the range under the original 1987 guideline, increased as follows[1]:

**1987**

| | |
|---|---|
| 2B1.1(a) – base offense level: | 4 |
| 2B1.1(b)(1)(L) – amount of loss over $1 million, less than $2 million: | 11 |
| 2B1.1(4) -  more than minimum planning: | 2 |
| 3B1.3 – abuse of position of trust: | 2 |

---

[1] These calculations include the abuse of position of trust enhancement as the probation officer has included it in her guideline calculation. The Defendant maintains her objection to said enhancement.

23

|  | 19 |
|---|---|
| 3E1.1 – acceptance of responsibility: | -2 |
| **TOTAL OFFENSE LEVEL** | **17** |
| **GUIDELINE RANGE** | **24-30 months** |

**1989**

|  |  |
|---|---|
| 2B1.1(a) – base offense level: | 4 |
| 2B1.1(b)(1)(O) – amount of loss over $1.5 million, less than $2.5 million | 14 |
| 2B1.1(4) -  more than minimum planning: | 2 |
| 3B1.3 – abuse of position of trust: | 2 |
|  | 22 |
| 3E1.1 – acceptance of responsibility | -2 |
| **TOTAL OFFENSE LEVEL** | **20** |
| **GUIDELINE RANGE** | **33-41 months** |

**2001**

|  |  |
|---|---|
| 2B1.1(a) – base offense level: | 6 |
| 2B1.1(b)(1) - amount of loss over $1.5 million, less than $2.5 million: | 16 |
| 2B1.1(b)(12)(A) – over $1 million in gross receipts from financial institution: | 2 |
| 3B1.3 – abuse of position of trust: | 2 |
|  | 26 |
| 3E1.1 – acceptance of responsibility | - 3 |
| **TOTAL OFFENSE LEVEL** | **23** |
| **GUIDELINE RANGE** | **46-57 months** |

**2003**

|  |  |
|---|---|
| 2B1.1(a) – base offense level: | 7 |
| 2B1.1(b)(1)(I) - amount of loss over $1.5 million, less than $2.5 million: | 16 |
| 2B1.1(b)(12)(A) – over $1 million in gross receipts from financial institution: | 2 |
| 3B1.3 – abuse of position of trust: | 2 |
|  | 27 |
| 3E1.1 – acceptance of responsibility | - 3 |

**TOTAL OFFENSE LEVEL**          **24**

**GUIDELINE RANGE**          **51-63 months**

**B. Five levels were added for the amount of loss in this case without basis in empirical date or national experience and without any demonstrated need to further any purpose of sentencing.**

In 1989, two years after the guidelines went into effect, three levels were added for a loss amount of between $1.5 million to $2.5 million. *See* USSG, App. C, Amend 99 (Nov. 1, 1989). As the official reason for the amendment, the Commission stated that it sought to:

> conform the theft and fraud loss tables to the tax evasion table in order to remove an unintended inconsistency between these tables in cases where the amount is greater than $40,000, to increase the offense levels for larger losses to provide additional deterrence and better reflect the seriousness of the conduct, and to eliminate minor gaps in the loss table. *Id.*

This reason was soon refuted. According to former Commissioner Michael K. Block (who had just resigned[2]) and former Deputy Chief Counsel Jeffrey S. Parker, the Justice Department's *ex-officio* member of the Commission had persuaded four of six Commissioners "that recent congressional enactments had given oblique 'signals' to the Commission to increase fraud penalties," when the statutes "said no such thing." Jeffrey S. Parker & Michael K. Block, *The Sentencing Commission*, *P.M. (Post-Mistretta)*: *Sunshine or Sunset?*, 27 Am. Crim. L. Rev. 289, 319 (1989). The Commission

---

[2] Paula Yost, *Sentencing Panel Member Resigns over Research*, Wash. Post, Aug. 23, 1989, at A25 (reporting that Commissioner Block resigned on August 22, 1989 "over what he said is a lack of commitment by commissioners to base decisions on research and scientific date when amending sentencing guidelines").

"gratuitously" increased punishment for larger fraud cases[3] for reasons that were "overtly political and inexpert," and abandoned its statutory mandates by failing to rely on its own data, failing to measure the effectiveness or efficiency of guideline sentences, and failing to provide analysis of prison impact. *Id.* at 318-320.

In 2001, another two levels were added for a loss amount of more than $1.5 million but less than $2.5 million as part of the Commission's Economic Crimes Package.[4] *See* USSG, App. C, Amend. 617 (Nov. 1, 2001). As the official reason for this amendment, the Commission stated that it was responding to "comments received from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and others, that [the embezzlement guideline] under-punish[es] individuals involved in moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under the guidelines." *Id.* While the Commission did not identify the "other guidelines" to which it referred, it is clear from the proceedings upon which the amendment was based that it referred to the drug guidelines. At the Commission's Economic Crimes Symposium in 2000, at which the issues and questions underlying the Economic Crimes Package were discussed by judges, stakeholders, and academics over a two day period, a formal question was posed and provided in writing: "[I]f there is a current problem with the guidelines that is in need of repair, is it that fraud and theft are punished too leniently or that drug crimes are punished too harshly?" U.S. Sent'g Comm'n, *Symposium on Federal Sentencing Policy for Economic Crimes and New Technology Offenses* 54 (2000)[5] [hereinafter *Economic Crimes Symposium*].

---

[3] The theft guidelines (2B1.1, et. seq) were also amended under the same rationale. *See* USSG, App. C, Amend 154 (Nov. 1, 1989).
[4] This amendment also merged the fraud sentencing guidelines (§2F1.1) and the embezzlement sentencing guidelines (§2B1.1) into §2B1.1.
[5] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposium/ePlenaryIII.pdf

Speaking on behalf of the Department of Justice, and in response to the moderator's question asking whether economic crimes should be "punished in the same way that we punish drug offenders," *Id.* at 55, Assistant Attorney General James K. Robinson stated that "sentences for economic crimes should not be set, in our view, to match sentences for drug crimes." *Id.* at 59, but should be set "in terms of the need to fulfill the purposes of sentencing," *Id.* at 58. Judge J. Phil Gilbert, speaking on behalf of the Criminal Law Committee of the Judicial Conference, stated that drug crimes are "punished too harshly," high loss fraud offenses are punished "too leniently," and they cannot be compared because they are "apples and oranges." *Id.* at 56. Dr. Mark Cohen, Professor of Economics at Vanderbilt University, stated that "drug offenses are broke so they need to be fixed," but that there was no "evidence that fraud is broke," and summarized research presented at the symposium demonstrating that increasing sentences for fraud would not serve the purpose of deterrence. *Id.* at 65-66, 69.

Nonetheless, as revealed by the question posed by the Commission and its reference to "penalty levels for offenses of similar seriousness sentenced under the guidelines," USSG, App. C, Amend. 617 (Nov. 1, 2001), the Commission ratcheted up the guideline range – by two levels as applicable in this case – based on the guidelines for drug offenses. This alone demonstrates that the increase was unsound, for the drug guidelines themselves were not based on empirical data or national experience. *See Gall*, 552 U.S. at 46 n.2; *Kimbrough*, 552 U.S. at 96. Instead, they were designed to be "proportional" to statutory mandatory minimums, *see* USSG §2D1.1 comment. (backg'd) (1987), lack any empirical basis, and dramatically increased sentences for drug offenses "far above what had been typical in past practice, and in many cases above the level required by the literal terms of the mandatory minimum statutes." *Fifteen Year Report* at 49. Moreover, contrary to the Commission's vague assertion, the comments the Commission

actually received did not indicate that the Commission should increase embezzlement penalties to approach or match drug penalties.

The explanations offered by the Commission for the two amendments which added five levels in this case are thus deficient and inaccurate. In both instances, the Commission amended the guideline not in the exercise of its characteristic institutional role as an independent expert body, but instead based on unsupported signals. The Commission ignored the overwhelming empirical research, discussed at length above and at the Economic Crimes Symposium, demonstrating that increases in sentence severity, as opposed to certainty, have no deterrent value, and it ignored the actual feedback from the district courts.

Though the Guidelines explicitly allowed (and still allow) for *upward* departures when the amount of loss does not "fully capture the harmfulness and seriousness of the conduct," *see* USSG § 2B1.1 comment. (n. 14) (2000), the sentencing courts granted upward departures in only .006% of cases sentenced under 2B1.1 in the year 2000, while they granted downward departures in almost 10% of cases and another 6% received departures for substantial assistance. *See* U.S. Sent'g Comm'n, 2000 Sourcebook of Federal Sentencing Statistics, tbl. 28 (2000); *see also Economic Crimes Symposium* at 63 (remarks of James Felman, co-chair of the Commission's Practitioner's Advisory Group) (citing similar statistics for fiscal year 1999, and also pointing out that in fraud cases, judges sentenced at the high end of the applicable guideline range less frequently than average and bottom of the range in the majority of the cases). This feedback from judges, the institutional actor best suited to make sentencing determinations, did not support any increase.

The 1989 and 2001 increases in the embezzlement guidelines led to the absurd result that first-time, nonviolent embezzlement offenders were subject to guideline ranges as high as those

imposed on armed drug traffickers and even higher than those applicable to the most violent offenders. *Compare* USSG § 2B1.1 2001 (offense level 24 for loss over $1.5 million and less than 2.5 million, abuse of trust, over $1 million in gross receipts) *with* USSG §2A4.1 (2001) (offense level 24 for kidnapping), § 2K1.4 (2001) (offense level 24 for arson creating substantial risk of death or serious bodily injury), § 2A1.3 (2001) (offense level 25 for voluntary manslaughter).

Moreover, while the amount of "loss" is the primary determinant of the offense level for fraud offenders, loss is a highly imperfect measure of the seriousness of the offense. *See United States v. Gupta* __ F. Supp. 2d ___ (SDNY Oct. 24, 2012) ("By making a Guidelines sentence turn on this single factor [loss or gain], the Sentencing Commission ignored [3553(a)] and … effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Adelson,* 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"). The amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ] moral seriousness … or the need for deterrence." *See United States v. Emmenegger,* 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004). Defendants rarely set out to defraud others of a specific amount of money; rather, the amount of loss is dependent on the security procedures in place and the point in time when the fraud happens to be detected. *Id.* "Had [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more." *Id.*

**C.  In 2001, the base offense level was increased by two levels for purposes of consolidating the fraud guidelines (2F1.1) with the theft guidelines (2B1.1).**

In 2001, as part of the Commission's Economic Crimes Package, the Commission consolidated the Theft Guidelines (§2B1.1) with the Fraud Guidelines (§2F1.1). *See* USSG, App. C, Amend. 617 (Nov. 1, 2001). The official reasoning by the Commission was that "[c]onsolidation will provide similar treatment for similar offense for which pecuniary harm is a major factor in determining the offense level and, therefore, decrease unwarranted sentencing disparity that may be caused by undue complexity in the guidelines…Commentators have noted that inasmuch as theft and fraud offenses are conceptually similar, there is no strong reason to sentence them differently." *Id.*

However, when the theft and fraud guidelines were consolidated, the base offense level for fraud (6) was maintained. *Id.* This represented a two-level increase for theft and property destruction offenses, which prior to the amendment were a level 4. *Id.* The Commission added that "the increase of two levels in the base offense levels for theft and property destruction offenses will have a minimal impact for low-level theft offenders in criminal history Category I or Category II." *Id.* As it is applied to this Defendant, the two-level increase resulted in a 20% increase in the advisory guideline range of Mrs. Huskins.

As stated above, because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. U.S.*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. 101-102; *Rita*, 551 U.S. at 351, 357.

### D.  The base offense level was increased by one level in response to political pressure and against the Commission's better judgment.

In 2003, the base offense level was increased from six to seven for defendants convicted of an offense with a statutory maximum of 20 years. *See* USSG App. C, Amend. 653 (Nov. 1,

2003). The Sarbanes-Oxley Act had raised statutory maximums for most fraud offenses after a "bidding war" in Congress. *See* Frank O. Bowman III, *Pour Encourager Les Autres?*, 1 Ohio State J. Crim. L. 373, 404 (2004). Thus, one level resulted in a 10% increase for most embezzlement offenders including Mrs. Huskins.

As its stated reason, the Commission pointed to Congress's directive in section 905(b)(2) of the Sarbanes-Oxley Act, Pub. L. No 107-204, which instructed it to consider whether the guidelines are "sufficient to deter and punish" certain economic crimes "in view of the statutory increases in penalties contained in the Act." *See* USSG App. C, Amend. 653 (Nov. 1, 2003) (Reason for Amendment). Having just substantially raised penalties in 2001, the Commission could have narrowly targeted the high-end corporate scandals that prompted the Sarbanes-Oxley act. That is what all commentators (other than the Department of Justice) advised, and the empirical evidence showed that across-the-board increases were unnecessary. The Department of Justice, however, placed intense pressure on the Commission to raise sentences for all §2B1.1 offenders. Nine months after the Sarbanes-Oxley Act was enacted, one Senator unilaterally inserted into the congressional record a "legislative history" stating that Congress meant the Commission to raise sentences for both high and low-level offenders, with special attention to the "penalty gap" between fraud (embezzlement) cases and narcotics cases. *See* Bowman, *supra*, at 411-32.

Accordingly, the Commission raised the base offense level from six to seven, stating that the amendment "responds to increased statutory penalties" and that the higher base offense level is "intended to calibrate better the base guideline penalty to the seriousness of the wide variety of offenses referenced to that guideline, as reflected by statutory maximum penalties established by Congress." *See* USSG App. C, Amend. 653 (Nov. 1, 2003). In doing so, the Commission once

again ratcheted up § 2B1.1 to more closely match the unsound drug guidelines, and explicitly tied the base offense level to the statutory maximum, thus abdicating to Congress its independent judgment regarding seriousness of the offense. *See Bowman*, *supra,* at 434.

    **E.  The specific offense characteristics applicable in this case impose cumulative punishment for the same harm.**

The first theft guidelines, §2B1.1, included five specific offense characteristics in addition to loss. *See* USSG § 2B1.1 (1987). Today, §2B1.1 includes nineteen cumulative specific offense characteristics, many with multiple alternatives. *See* USSG § 2B1.1 (2014).

The two-point enhancement for gross receipts in excess of $1 million from the State Bank of Lincoln adds an additional 10-12 months onto Mrs. Huskins' sentence, which serves as a double enhancement to the guideline increase for the amount of loss. "In effect, what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus." *See* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 170 (Fed. 2008). "The result is that many factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself." *Id*.; *See also* Alan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011) ("multiple, overlapping enhancements also have the effect of 'double counting' in some cases," while "the guidelines fail to take into account important mitigating offense and offender characteristics.").

The Commission has recognized this problem of "factor creep," in which "as more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the

interactions among them, and their cumulative effect, properly track offense seriousness."

*Fifteen Year Report* at 137. In 1999, Justice Breyer warned that "[t]here is little, if anything, to

be gained in terms of punishment's classical objectives by trying to use highly detailed offense

characteristics to distinguish finely among similar offenders. And there is much to be lost, both

in terms of Guideline workability and even in terms of fairness (recall the Guidelines'

logarithmic numerical scales)…The precision is false." *See, e.g.,* Justice Stephen Breyer, *Federal*

*Sentencing Guidelines Revisited*, 11 Fed. Sent'g Rep. 180 (1999).


### PRAYER FOR RELIEF

Defendant, Nancy J. Huskins, prays this Honorable Court to conduct a sentencing hearing

and to sentence the Defendant to a sentence of one year and a day and for such other and further

relief as this court deems just and equitable.


Respectfully submitted,
**NANCY J. HUSKINS**, Defendant


BY:        /s Daniel Noll                   
             DANIEL NOLL
             Attorney for the Defendant
             Reg. No. 228987
             Noll Law Office, LLC
             930 East Monroe Street
             Springfield, IL  62701
             (217) 544-8441
             (217) 544-8775 (fax)
              Email: dan@noll-law.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 5, 2015, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notification of such filing to the

following:

      John Childress
      Assistant U.S. Attorney
      318 S. Sixth Street
      Springfield, IL 62701

and I hereby certify that I have mailed by United States Postal Service the document to the
following non-CM/ECF participants:

      Nancy Huskins
      902 S. Kickapoo
      Lincoln, IL 62656

      Michele Cyrus
      U.S. Probation Office
      600 East Monroe St.
      Springfield, IL 62701

      BY:   <u>/s Daniel Noll       </u>
           DANIEL NOLL
           Attorney for the Defendant
           Reg. No. 228987
           Noll Law Office, LLC
           930 East Monroe Street
           Springfield, IL  62701
           (217) 544-8441
           (217) 544-8775 (fax)
           Email: dan@noll-law.com

---

[i] United States v. Milton, Case No. 3:06-cr-00137, Docket Entry 1216 (D. Conn. Jan. 30, 2009)(Judgment); United States v. Milton, No. 3:06-cr-00137, Docket Entry 1164 (D. Conn. October 31, 2008)(Ruling on Loss Calculation, Victim Enhancement, and Restitution).

ii United States v. Ferguson, Case No. 3:06-cr-00137, Docket Entry 1199 (D. Conn. Dec. 31, 2008)(Judgment); United States v. Ferguson, Case No.3:06-cr-00137, Docket Entry 1164 (D. Conn. October 31, 2008)(Ruling on Loss Calculation, Victim Enhancement, and Restitution).

iii United States v. Whittier, Case No. 1:07-cr-0087, Docket Entry 12 (S.D.N.Y. October 18, 2007)(Judgment). *See also,* United States v. Whittier, 1:07-cr-0087, Docket Entry 14 (S.D.N.Y. Nov. 6, 2007)(Transcript of Sentencing Hearing).

iv United States v. Adelson, 441 F. Supp. 506, 514 (S.D.N.Y. 2006), aff'd 2008 WL 5155341 (2d Cir. Dec. 9, 2008). *See also* United States v. Adelson, Case No. 1:05-cr-00325, Docket Entry 86 (S.D.N.Y. June 6, 2006)(Judgment).

v The district court originally imposed a sentence of 292 months (a sentence within the then-mandatory guideline range) after finding an actual loss amount of $105 million. United States v. Olis, 429 F. 3d 540, 542 (5th Cir. 2005). On appeal, the Fifth Circuit vacated the sentence, finding that the district court's "loss calculation did not take into account the impact of extrinsic factors on Dynegy's stock price decline." *Id.* at 548-49. On remand, the district court concluded that the actual loss of shareholders could not be reasonably calculated. United States v. Olis, 2006 WL 2716048, at *10 (S.D. Tex. Sept. 22, 2006). The court, therefore, relied on the intended loss figure of $79 million. Id. The new loss amount changed the guidelines range to 151-181 months. *Id.* The court then went on to grant a variance below this advisory range to arrive at a final sentence of just 72 months. *Id.* at 11-13.

vi In its Sentencing Memorandum, the Government argued for a loss calculation of $2.2 billion and set forth the two possible Guideline calculations. United States v. Richards, Case No. 1:04-cr-00846, Docket Entry 223 (E.D.N.Y. Nov. 2, 2006). *See also* United States v. Richards, Case No. 1:04-cr-00846, Docket Entry 283 (E.D.N.Y. Nov. 22, 2006)(Judgment).

vii United States v. Argo, Case No. 1:07-cr-00683, Docket Entry 14 (S.D.N.Y. Jan. 23, 2008)(Government's Sentencing Memorandum). See also United States v. Argo, Case No. 1:07-cr-00683, Docket Entry 16 (S.D.N.Y. Jan. 29, 2008)(Judgment).